IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BRYAN K. AMBELANG
  Plaintiff,            ORDER

  v.                 12-cv-805-wmc

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

  Defendant.

Pursuant to 42 U.S.C. § 405(g), plaintiff Bryan Ambelang seeks the remand of an administrative law judge's finding that he was not disabled within the meaning of the Social Security Act on or before September 30, 2007. Ambelang principally contends that remand is warranted because the ALJ's decision regarding his residual functional capacity ("RFC") fails to address his "mental limitations," including limitations in working with supervisors. Ambelang further contends that this failure ultimately tainted evidence supplied by the vocational expert. For the reasons set forth below, the court agrees and this case will be remanded to the Commissioner for rehearing.

## BACKGROUND

### A. Procedural History

Ambelang filed an application for disability insurance benefits ("DIB") on August 25, 2009 (AR 68-69). He alleged an onset date of August 1, 2007. (AR 131.) His application was denied initially and upon reconsideration. (AR 78-82, 91-94.) Following a hearing on March 2, 2011 (AR 31-67), Administrative Law Judge Lisa Groeneveld-Meijer (the "ALJ") issued a decision concluding that Ambelang was not disabled within

the meaning of the Social Security Act from August 1, 2007 through the date last insured, September 30, 2007. (AR 14-60.) The Appeals Council denied Ambelang's request for review on September 19, 2012 making the ALJ's decision the final decision of the Commissioner. (AR 1-6.) 20 C.F.R. §§ 404.955; 404.981. On November 7, 2012, Ambelang filed a timely complaint for judicial review in this court pursuant to 42 U.S.C. §405(g).

### B. Date Last Insured

To be entitled to disability insurance benefits, a claimant must have sufficient quarters of coverage insuring him for benefits. 42 U.S.C. § 423(a)(1)(A), (c)(1); *see also* 20 C.F.R. § 404.101(a). Although a claimant may be insured at one time, that insured status may expire. 20 C.F.R. § 404.130(b). A claimant is only entitled to disability insurance benefits if he was "under a disability" within the meaning of the Social Security Act by the date his insured status expired. 20 C.F.R. §§ 404.131(a), 404.320(b)(2); *Liskowitz v. Astrue*, 559 F.3d 736, 740 (7th Cir. 2009) ("[A] claimant must show that the disability arose while he or she was insured for benefits.").

Ambelang does not dispute that his date last insured was September 30, 2007 (AR 69). As such, he has the burden of proving that he was disabled starting on or before that date. *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008).

### C. Medical Evidence Before Date Last Insured (September 30, 2007)

On April 3, 2006 Ambelang had a mental health intake assessment at Access, Inc. ("Access") (AR 246-48). Ambelang stated that he had a history of mood instability and

outbursts of anger and rage. (AR 246.) At that time, Ambelang was diagnosed with major a depressive disorder and was assigned a Global Assessment of Functioning("GAF") score of 53. (AR 248.)

Ambelang continued to go to Access during April and May of 2006 for therapy and medication. (AR 239-243.) On May 23, 2006, Dr. Rugowski, Ambelang's psychiatrist, diagnosed Ambelang with bipolar disorder, type II. (AR 251.) Ambelang reported a "temper problem since childhood" and stated that he found it difficult to work with others because he gets "annoyed." (AR 250.) Dr. Rugowski found that Ambelang's mood was not depressed, his affect showed full range, and his insight and judgment were intact. (AR 250-51.) At that time, Rugowski prescribed Cymbalta and Seroquel and assigned Ambelang a GAF score of 58. (*Id.*)

Ambelang continued to go to Access for medication checks and counseling from June through October of 2006. (AR 229-36.) On July 25, 2006, he called his counselor and stated that he was no longer taking his medications because they were not working. (AR 235.) Ambelang discussed his decision with Dr. Rugowski on August 1, 2006, (AR 249), explaining that he discontinued the medication on his own and wanted to consider other medications. (*Id.*) On August 22, 2006, Ambelang was depressed and reported that he had destroyed a truck in anger. (AR 234.) His counselor discussed his non-compliance with therapy sessions, other appointments, and medications. (*Id.*)

On August 26, 2006, after discovering that his girlfriend was involved with someone else, Ambelang feared hurting the man and his girlfriend. He self-reported to the police and was admitted to the hospital under police escort. (AR 215-19.) Ambelang

3

was cooperative with medication during his time in hospital, displayed a willingness to seek outpatient care, and on discharge had a GAF score of 55. (AR 215.)

At a visit to Access on September 5, 2006, shortly after his release from the hospital, Ambelang reported that he had not "felt this good for a long time" and that he was sleeping well and working. (AR 231.) By October 31, 2006, Ambelang was only "sort of" medically compliant, but was still working and his current mental status was almost normal with only mild problems in insight and judgment. (AR 239.)

On April 3, 2007, the Burnett Country Health Department evaluated Ambelang while in jail. (AR 252-67.) The evaluation stated that Ambelang was stable, alert, oriented and safe to be in the jail. *Id.* It also concluded that Ambelang's behavior did not suggest a risk of assault to staff or other inmates. (AR 265.)

### D. Medical Evidence After Date Last Insured (2009-2011)

Ambelang was admitted to the hospital in March 2009. After becoming very angry at another individual and "concerned at the level of his own anger," he called the police. (AR 271.) During intake, Ambelang stated that he was having trouble with the frequent changes in medication by Dr. Rugowski and, because of that, he had not taken any prescribed medicines in the past year. (*Id.*) After his discharge, he saw Dr. Agrawal, a psychiatrist, and Chris LeClair, a case worker, through at least February of 2011. (AR 197-105, 292-99, 381-91, 406-12, 440-4, 423-39, 443-77.)

State agency psychological consultant Dr. Mandli, Ph.D., completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique on March

29, 2010, for the purpose of evaluating Ambelang's status between his alleged onset date, August 30, 2007, and his date last insured, September 30, 2007. (AR 319-40.) During this period, Dr. Mandli opined that Ambelang had moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, but was nevertheless capable of performing the basic mental demands of unskilled work. (AR 325-37.)

On December 4, 2009, state agency psychiatrist Benjamin Blackman also completed a Psychiatric Review Technique opining that while the medical evidence of record for 2009 indicated the presence of a "severe mental impairment," it did not support the presence of a severe mental impairment before his last insured date of September 30, 2007. (AR 312.) Further, Blackmon found the medical evidence in the record from 2006 was insufficient to establish the severity of Ambelang's mental impairments before September 30, 2007. (*Id.*)

Ambelang's treating psychiatrist, Dr. Agrawal, wrote a letter on January 26, 2011, stating that he began treating Ambelang on March 30, 2009, and diagnosed Ambelang with cyclothymic disorder, provisional (with a rule out of bipolar affective disorder type II) and generalized anxiety disorder (AR415). In Dr. Agrawal's "clinical opinion, both of these conditions affect [Ambelang's] ability to be substantially gainfully employed." (*Id*.)

Chris LeClair, Ambelang's case worker, wrote a letter on February 24, 2011, stating that while he had not seen Ambelang weekly since January 25, 2010, Ambelang's symptoms fluctuated and were severe enough on a monthly basis that it would "affect his ability to be substantially gainfully employed." (AR 481.)

E.  **Ambelang's Hearing Testimony**

On March 2, 2011, Ambelang testified at his disability hearing. At that time, he was living with his two-year-old son in his mother's home; however, his mother lived elsewhere. (AR 37-38.) His mother stopped by almost every day to assist with the household duties; she also helped with the child's laundry and meals. (AR 40.) He testified that stress-related black outs had started a few years before the hearing. (AR 38.) These blackouts occurred about once per week, but there was no warning as to when they would occur. (AR 38-40.) When they occurred, however, Ambelang was able to call his mother or sister to help with his son. (AR 41.) If they were unavailable, he called his neighbor. (AR 41.)

At the time of the hearing, Ambelang met with his counselor about every three weeks. (AR 42.) He had a period where he was off his medication between 2006 and 2008, but indicated that he did not do well. (AR 44.)

Ambelang also reported conflicts with his supervisors. At one time, while working as a welder, a boss criticized him for an error relating to a building blue print. This resulted in a verbal confrontation with the boss and his termination. (AR 45.) He also worked as a painter, but because he could not get along with the other employees, his boss put him on jobs separate from coworkers. This job ended when Ambelang physically assaulted his boss. (AR 46.) Ambelang was also fired from a community based program because he was tired and somewhat incoherent from his mental health medications. The employer thought he was "high" and terminated him. (AR 47.) Ambelang also did some recycling for cash for a period of time and worked constructions

for 20 hours per week for five to six months. (AR 47-48.) He stopped his construction work because of blackouts and problems dealing with coworkers and supervisors. (AR 49.)

At the time of the hearing, Ambelang was supporting himself with food and propane assistance and support from his mother. (AR 50.) His caseworker went with him to his doctor appointments. (AR 51.) He reported not sleeping one night per week and whenever there was a full-moon. (AR 52.) He also confirmed a history of both verbal and physical outbursts, noted that he had three or four hospitalizations for suicide attempts, and reported that he was unable to complete tasks and that his mind raced. (AR 53-55.)

F.  **Testimony of Chris LeClare**

Chris LeClare, Ambelang's social worker, also testified at the hearing. (AR 55.) She provided transportation and help to Ambelang with regard to paperwork and to understand things. LeClare reported having seen one of Ambelang's blackouts, noting that during a stressful telephone call with the mother of his child, he "got dizzy and you could tell the change in him." (AR 56.) She also experienced Ambelang's cycling and reported a that during a manic phase, he would be awake for days until he "reached a point of exhaustion." (AR 57.)

G.  **Administrative Hearing**

On April 15, 2011, ALJ Groeneveld-Meijer completed a ten-page decision. She found that Ambelang: (1) last met the insured status requirements of the Social Security

Act on September 30, 2007; (2) had not engaged in substantial gainful activity during the period from his alleged onset date of August 1, 2007, through this date; and (3) had as severe impairments bipolar disorder and type II rapid cycling, as well as a history of drug and alcohol abuse. (AR 19.)[1] Based on these impairments, the ALJ determined that Ambelang had an RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: he could perform simple work, with no more than three to four steps; in work that was free of fast-paced production requirements, required only simple work-related decisions and few changes day-to-day; and included no interaction with the public, no tandem tasks with coworkers and only brief and superficial interaction with co-workers." (AR 19-20.)

At step four, the ALJ determined that Ambelang was unable to perform any past relevant work, including work as a welder or construction laborer, both semi-skilled positions. Turning to step five, the ALJ found "through the date last insured, considering (Ambelang's) age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (AR 25.) Accordingly, the ALJ found that Ambelang was *not* under a disability, as defined in the Social Security Act, at any time from August 1, 2007, the alleged onset date, through September 30, 2007, the date last insured.

---

[1] The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520, 416.920. A finding of disability requires an affirmative answer at either step three or step five. *See Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

## OPINION

When a federal court reviews a final decision by the Commissioner of Social Security, the Commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Even so, a district court may not simply "rubber-stamp" the Commissioner's decision without a critical review of the evidence. *See Ehrhart v. Secretary of Health and Human Servs.,* 969 F.2d 534, 538 (7th Cir. 1992). A decision cannot stand if it lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

"Although a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record." *Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000) (citing *Thompson v. Sullivan,* 933 F.2d 581, 585 (7th Cir. 1991)); *see also Richards v. Astrue* , 370 F. Appx. 727, 731, 2010 WL 1443893, at *3 (7th Cir. Apr. 13, 2010) ("[A]n ALJ may not draw conclusions based on an undeveloped record and has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable"); *Smith*, 231 F.3d at 437 ("Failure to fulfill this obligation is 'good cause' to remand for gathering of additional evidence.")

I.  **The ALJ failed to address Ambelang's "mental limitations"**

Ambelang principally challenges the ALJ's failure to translate limitations in concentration, persistence and pace ("CPP') into discernible limitations in the RFC. This, Ambelang argues, had a ripple effect at step five of the ALJ's evaluation process by tainting the hypothetical questions proposed to the vocational expert.  The court agrees.

The RFC assessment is made by the ALJ "based on all the relevant evidence in [the claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  The RFC is an assessment of the most a claimant can do despite his or her limitations.  *Id.*  Examples of the types of evidence required to be considered in making an RFC assessment are the claimant's medical history, medical signs and laboratory findings, and medical source statements. Soc. Sec. Ruling ("SSR") 96–8p.

An ALJ must make specific RFC findings based on all of the relevant evidence in the case record.  SSR 96–8p states:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Here, the ALJ purportedly accommodated for Ambelang's moderate limitations in CPP by including the following limitations in the RFC determination: "[1] simple work, with no more than three to four steps; [2] in work that was free of fast-paced production

requirements, requir[ing] only simple work-related decisions and few changes day-to-day; and [3] [work] with coworkers and only brief and superficial interaction with co-workers. However, these limitations are deficient for at least two reasons.

*First*, the ALJ fails to provide any real explanation of how she arrived at limitations (1)-(3). While there is some discussion rationalizing the limitations, the ALJ's narrative is inconsistent with other findings in the decision. For example, the Commissioner suggests that the ALJ noted that Ambelang could do "simple tasks" because he was able to do simple tasks as a welder in the past. (AR 24.) The problem with this rationale is that the ALJ later finds that Ambelang was *not* capable of past jobs, such as welding and construction. (AR 25.) Thus, the foundation for the RFC finding at step four regarding "simple tasks" is undercut at step five by the ALJ's own analysis. Such inconsistencies mandate remand, particularly when there is little (if any) further evidentiary analysis. *See* SSR 96–8p ("RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts"); *see also Huber v. Astrue*, 395 Fed. Appx. 299, 302 (7th Cir. 2010).

*Second*, while the RFC limitations do seem to accommodate for Ambelang's limitations as to *pace,* the limitations fail to address his moderate limitations in concentration and persistence. Specifically, the ALJ restricts Ambelang to an environment that is free of fast-paced production requirements, but includes *no* apparent limitations in concentration and persistence. The ALJ must explain her analysis of the evidence -- including the RFC -- with enough detail and clarity to permit meaningful appellate review. *See Herron v. Shalala*, 19 F.3d 329, 333–34 (7th Cir. 1994). While the

11

Seventh Circuit has yet to provide definite guidance as to what is specifically required in the RFC to accommodate for moderate limitations in CPP, a district court may not simply "rubber-stamp" the Commissioner's decision without a critical review of the evidence. *See Ehrhart,* 969 F.2d at 538. On remand, therefore, the ALJ must better explain how its RFC formulation accommodates her findings of moderate limitations in concentration and persistence.[2] *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001) (an ALJ must build a logical bridge between the record evidence and the CPP findings).

**II. Ambelang's Inability to Deal With Supervisors**

Ambelang also challenges the ALJ's RFC determination for failing to properly address his limitations in dealing with supervisors. While the RFC determination states that Ambelang is not to have interaction with the public, and only superficial interaction with co-workers, there is *no* express limitation with respect to supervision. The Commissioner's own Social Security Ruling provides that one of the "basic mental

---

[2] The court is not unsympathetic to the lack of guidance that has been afforded to the Commissioner on this issue. *See generally O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). But to accommodate for concentration and persistence, the ALJ may be well served supplying approximate times or percentages to indicate to the vocational expert the degree to which the claimant would be off task each day. Presumably, such percentages would reflect the claimant's ability to concentrate (be on task) despite their moderate limitations. *See Scott v. Astrue,* 2010 WL 1640193 * 9 (N.D.Ill. April 22, 2010) (ALJ hypothetical question equated moderate limitations in concentration, persistence and pace with being off task for 10% of the day); *Reid v. Astrue*, 2009 WL 5062143 *2 (N.D.Cal. December 23, 2009) (ALJ equated moderate limitations in concentration, persistence and pace to being off-task for 10% of the day). The ALJ could also indicate the (1) number of breaks that the claimant may need to take each day and, (2) the number of days the claimant would likely be absent per month. These are just examples that might be employed to give meaning to a finding of moderate limitations in persistence. While there is no case law by the Seventh Circuit that approves of these RFC limitations to properly accommodate CPP, these limitations would seem to provide a more meaningful RFC assessment for the vocational expert. *See* 20 C.F.R. § 404.1545(a)(1). Of course, each case will be dependent upon the medical record and no set formula will provide a magic bullet.

demands of unskilled work include the abilities to . . . respond appropriately to supervisors." SSR 85-15. The lack of any limitation addressing supervisors is particularly puzzling given substantial evidence in the record warranting one. (AR 45-50.) Indeed, Ambelang's history of verbal and physical confrontations with those in authority at the workplace is nearly overwhelming.

This error is compounded by the fact that there is nothing in the record to suggest that the ALJ discounted Ambelang's dismal track record with supervisors. Because of this, and because of the need for the RFC to reflect the most a claimant can do despite his limitations, it is necessary to remand so that the ALJ can insure the RFC reflects this limitation in the record. *See* 20 C.F.R. § 404.1545(a)(1).

The Commissioner argues that the ALJ already accommodated for the supervisor deficiency. Specifically, the Commissioner contends that the limitation was accommodated when the ALJ asked the the vocational expert what kind of interaction would be required between a supervisor and employee for the jobs listed (*i.e.* cleaner, line worker etc.). (AR 64.) The vocational expert answered: "brief, usually . . . superficial" (*Id*.) Therefore, the Commissioner argues that if there was error in the ALJ's RFC determination, the error was harmless because the vocational expert was fully apprised of Ambelang's limitations with respect to past supervisors.

This argument is, however, problematic on a number of levels. As noted, SSR 85-15 expressly provides that "unskilled workers" (as Ambelang is categorized at step five) must be able to "respond appropriately to supervisors," and then goes on to say that "[a] substantial loss of ability to meet [this] basic work-related activity would severely limit

the potential occupational base. This, in turn, would justify a finding of disability." *Id.* Given the significance of this ruling (and its implications regarding a disability finding), the court is hard pressed to find that the ALJ's deficiency is harmless. Indeed, the error would seem to fall into the serious end of the spectrum, notwithstanding the vocational expert's added understanding of the Ambelang's limitations noted in the hypothetical question.

Accordingly, like the first, this issue warrants remand. Although the ALJ is free to reweigh the evidence further, it would seem that there is substantial evidence in the record to require an express limitation on Ambelang's ability to interact with supervisors.

## III. Vocational Expert Questions

Finally, Ambelang contends that the ALJ erred with respect to the hypothetical questions proposed to the vocational expert for failing to reflect all of his mental limitations. Such error, Ambelang says, derives from a deficient RFC determination. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) (stating "hypothetical questions posed to [VE's] ordinarily must include all limitations supported by medical evidence in the record.") For reasons already discussed, the court agrees.

More specifically, the limitations omitted from the RFC finding -- for example, the limitations going to CPP -- are omitted from the ALJ's hypothetical questions to the vocational expert. Based on existing case-law, the court finds that these defects taint the substantiality of the vocational expert's opinion and further warrants remand. *Id.* at 942 (when posing his hypothetical to the VE, the ALJ was required to include all of a claimant's limitations "to ensure that the vocational expert [did] not refer to jobs that the

claimant cannot work"); *O'Connor Spinner* 627 F.3d at 619 ("Among the limitations the VE must consider are deficiencies of concentration, persistence and pace"); *see also Hargis v. Sullivan,* 945 F.2d 1482, 1492 (10th Cir. 1991) (stating that "testimony elicited by hypothetical questions that do not relate with precision to all of a claimant's impairments cannot constitute substantial evidence to support the [Commissioner's] decision").

Of course, it is possible that the ALJ's formulation of Ambelang's RFC included the implicit finding that the unaccounted for limitations for persistence and pace or ability to accept supervision were not sufficiently pronounced on or before the last date of insurance. If so, the ALJ is free to so hold, but must do so explicitly, adequately explaining her reasoning given evidence to the contrary in this record.

ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying Bryan Ambelang's application for disability insurance benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 30th day of September, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge